# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

**MARY D. ALHIN,**

      **Plaintiff,**                **CIVIL ACTION NO. 07-12352**

      vs.                     **DISTRICT JUDGE PATRICK J. DUGGAN**

                              **MAGISTRATE JUDGE MONA K. MAJZOUB**

**COMMISSIONER OF**
**SOCIAL SECURITY,**

      **Defendant.**

_____/

## REPORT AND RECOMMENDATION

**RECOMMENDATION:** This Court recommends that both Defendant's and Plaintiff's Motions for Summary Judgment (docket nos. 7, 11) be DENIED and the instant case remanded for further proceedings consistent with this report and recommendation.

*\*\*\**

Plaintiff filed an application for Disability and Disability Insurance Benefits on July 28, 2003 alleging that she had been disabled and unable to work since June 10, 2002 as a result of a crushed tailbone and disc problems resulting from an automobile accident. (TR 51-54, 119, 120). The Social Security Administration denied benefits. (TR 27-30). A requested *de novo* hearing was held on June 29, 2005 before Administrative Law Judge (ALJ) Michael E. Finnie. (TR 16, 25, 280). The ALJ subsequently found that the claimant was not entitled to a period of disability or Disability Insurance Benefits because she was not under a disability at any time through the date of the ALJ's December 8, 2005 decision. (TR 25). The Appeals Council declined to review the ALJ's decision and Plaintiff commenced the instant action for judicial review. (TR 4). The parties filed Motions for Summary Judgment. The issue Plaintiff raises for review is whether the ALJ's decision is

supported by substantial evidence.

Plaintiff was 48 years old at the time of the administrative hearing. (TR 289). Plaintiff has a ninth grade education which she received in Jordan. (TR 289). Plaintiff reads and writes in English. (TR 289). Plaintiff owns three Dollar Store businesses and has been in that business since 1992. (TR 290). Plaintiff was in an automobile accident on June 10, 2002. Plaintiff alleges that her tailbone was crushed and she suffers from a bulging and deteriorating disk and nerve damage. (TR 296). Plaintiff reports pain in her tailbone, both hips and legs. (TR 222, 297).

Plaintiff testified that since her accident she has not been able to properly take care of her businesses and at the time of the hearing all three stores were under Chapter 11 bankruptcy. (TR 77, 291). Plaintiff testified that her son helped her with one of the stores until the stress became too much and he left the position. (291-92). As a business owner, Plaintiff drives between the stores on a regular basis every day or every other day and one of the stores is a three hour drive from the others. (TR 75, 128, 292). Plaintiff checks the inventory at the stores, then travels to Detroit to wholesalers to buy inventory. (TR 293). She sometimes flies to trade shows or showrooms for merchandise. (TR 293, 303). An accountant handles the books, accounts, payroll and timesheets for Plaintiff's business. (TR 290, 294). One of Plaintiff's Dollar Store employees reported that Plaintiff used to work beside the employees to show them "what to do," but now Plaintiff has trouble standing. (TR 84). The vocational expert (VE) testified that Plaintiff has past work experience as a retail store proprietor or retail store manager, and as a waitress, food preparation clerk and cashier. (TR 305-06).

Plaintiff reports that lifting, standing, walking, sitting, climbing stairs, kneeling, squatting and reaching are affected by her conditions and she has to lie flat after a few hours of activity. (TR

2

77). Plaintiff uses a cane prescribed by a doctor. (TR 299). She also uses a brace and a massage unit cushion for her tail bone. (TR 77). She reports that she can only sleep one to two hours a night due to pain in her tail bone and leg. (TR 98).

Plaintiff performs her own personal care tasks but it takes her additional time to dress herself. (TR 74). She reports that since the onset of her condition and due to the pain, she does not care what she wears anymore or how she looks and she does not enjoy any activities. (TR 131). Plaintiff lives with her son and he takes care of her house and does the yard work because it hurts for her to be on her feet "for any period of time." (TR 72, 75, 289, 291). On June 17, 2005 Plaintiff reported that on a typical day she goes shopping for fruit and does crafts projects. (TR 126).

Plaintiff has not had surgery but by the time of the hearing Plaintiff had three injections to treat her pain. (TR 297). She testified that she was also rejected for injections three times last year because she did not have insurance. (TR 297). Plaintiff underwent physical therapy. (TR 298). Plaintiff rates her pain an eight on a ten scale and states that sometimes the medication does not help. (TR 298). Plaintiff testified that she takes Codeine, Morphine and Kadian for pain. (TR 133, 298).

A state agency residual functional assessment concluded that Plaintiff could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, stand and walk with normal breaks for about six hours in an eight-hour workday and sit with normal breaks for about six hours in an eight hour workday. (TR 307). Plaintiff testified that she disagreed with the assessment. (TR 307). Plaintiff estimates that she could only lift five pounds or less. (TR 307). Plaintiff alleges that she cannot sit on her tailbone and for every hour she sits she has to get up and walk for up to fifteen minutes, even when she is driving. (TR 308). Plaintiff was unable to estimate how many hours she could sit in an eight-hour day and said it would depend on the day. (TR 309). Plaintiff reports that

3

she attempted to work from May 2005 to June 2005. (TR 132).

Plaintiff testified that she has asthma and uses an inhaler but has not had medical treatment or gone to the hospital or emergency room as a result of it any time recently. (TR 300). Plaintiff had problems with migraine headaches in the past, but testified that this is not currently a problem that impacts her ability to work. (TR 301). Plaintiff was treated for depression and anxiety and was prescribed Prozac and BuSpar. (TR 301). She states that the depression and anxiety impact her ability to work. (TR 301). She reports getting crabby or anxious when she is under stress or pain. (TR 78). Plaintiff testified that she is not in counseling for depression and is not currently taking medication for depression or anxiety. (TR 302).

Plaintiff testified that she has problems with maintaining concentration and attention and she sometimes loses her train of thought if she is talking about something, however, she states that she does not have any problems completing tasks due to an inability to focus or concentrate long enough to finish. (TR 78, 103, 302). The state agency interviewer noted that in a face to face interview with Plaintiff on May 18, 2005, Plaintiff had difficulty concentrating, answering, sitting, standing and walking. (TR 117). The interviewer noted that Plaintiff used a cane to walk, was uncomfortable sitting for very long, had trouble remembering dates and was somewhat hard to understand due to her accent. (TR 117).

## *Medical Evidence*

On June 19, 2002 Jo Nel Scovel, D.O. examined Plaintiff for complaints of recurring low back pain. (TR 191). Plaintiff reported that she had begun feeling better, then lifted a heavy box at work, resulting in further pain. (TR 191). Plaintiff was referred to physical therapy. (TR 157, 191). Plaintiff was discharged from physical therapy on July 18, 2002 because she did not attend

4

the last three scheduled appointments, despite being contacted by letter regarding the same. (TR 158). On August 5, 2002 Kevin E. Anderson, M.D. refilled Plaintiff's prescription for physical therapy for back pain. (TR 190). Plaintiff attended 20 of 22 therapy sessions and was discharged on December 17, 2002. (TR 167). The therapist noted that Plaintiff's outcome expectations were not met and insufficient gains were expected with continued treatment. (TR 167).

On August 7, 2002 Dr. Scovel examined Plaintiff for complaints of sore throat, shortness of breath, dizziness and swollen neck and noted that Plaintiff reported that she is "spending her entire life working right now." (TR 189). Dr. Scovel examined Plaintiff on September 13, 2002 for complaints of low back pain. (TR 186). Plaintiff complained of being depressed and under a lot of stress. (TR 186).

October 16, 2002 x-rays of Plaintiff's lumbosacral spine were negative and revealed normal alignment, no evidence of compression fracture or spondylolysis, intervertebral disk heights well maintained and no significant degenerative changes. (TR 160). Plaintiff was examined electrodiagnostically on November 5, 2002 by Charles J. Danek, M.D. who noted no abnormalities in the areas searched, including the left lower extremity and lumbosacral paraspinals. (TR 161). Dr. Scovel examined Plaintiff on November 15, 2002 and noted that Plaintiff reported attending a trade show in Chicago and upon return she had difficulty walking due to low back pain. (TR 184). Plaintiff reported taking Ultram 50 mg., which was helping her pain. (TR 184).

On November 21, 2002 Plaintiff treated with Maria Josefa Ruiz, M.D. for leg pain. (TR 222). Dr. Ruiz noted sacroiliac joint pain, coccygeal pain, lumbar radiculopathy, depression and anxiety. (TR 223). Dr. Ruiz ordered pelvic and hip x-rays and an MRI of the lumbar spine and prescribed Percocet and a donut-type pillow for pain. (TR 223). Plaintiff was advised to continue

5

taking BuSpar for depression and follow-up with her primary doctor. (TR 223). A December 17, 2002 MRI of the lumbar spine revealed a mild diffuse annular bulge at the L4/5 level, but no evidence of disc herniation or nerve root effacement and mild degenerative facet arthritis at L4/5 and L3/4. (TR 163, 220). The December 17, 2002 x-rays of the bilateral hips were normal. (TR 164). In January 2003 Plaintiff continued to have paresthesias into her lower extremity with coccygeal pain. (TR 220). Plaintiff reported that neither Percocet nor the donut pillow were helpful in decreasing her pain significantly and Dr. Ruiz prescribed Darvocet and Soma for pain and spasm control. (TR 220).

On January 25, 2003 Dr. Anderson examined Plaintiff for her complaints of chronic back and leg pain, an allergic reaction including congestion and rhinitis, and her request to resume hormone therapy treatment to control her hot flashes. (TR 183). Dr. Anderson noted that Plaintiff was taking Darvocet, Soma, Albuterol and Claritin. (TR 183). Dr. Anderson prescribed Cenestin and Depo Medrol followed up with Medrol Dosepak. (TR 183).

On March 12, 2003 Plaintiff underwent an L4-L5 transforaminal epidural steroid injection and a caudal epidural steroid injection on the left side to treat lumbar radiculopathy and coccygeal pain. (TR 169). On April 11, 2003 Plaintiff reported some improvement of low back and leg pain after her injection, but her pain returned to baseline levels. (TR 219). Plaintiff was advised to continue Darvocet and Soma for pain control and was prescribed physical therapy. (TR 219).

On May 30, 2003 Plaintiff complained of left leg pain and increased pain in her left S1 joint and reported that Darvocet and Soma were not helpful in controlling her pain. (TR 218). Plaintiff did not attend physical therapy due to a "lack of time" and the demands of her job. (TR 218). Dr. Ruiz prescribed methadone for pain control and provided a prescription for a coccygeal seat and a

straight cane to improve her sitting tolerance and ambulation. (TR 218). In June 2003 Plaintiff was again prescribed physical therapy to treat sacroiliac pain. (TR 229).

On June 30, 2003 Plaintiff went to the emergency room for back and hip pain. (TR 174). X-rays of Plaintiff's pelvis showed mild axial migration of the femoral heads in the acetabular cavities greater on the left than the right, but was otherwise normal. (TR 178). X-rays of the lumbar spine showed mild degenerative facet changes at the L4-5 and L5-S1 levels and was otherwise negative with no significant interval change. (TR 178).

On July 3, 2003 Dr. Ruiz examined Plaintiff following an increase in Plaintiff's pain and her trip to the emergency room. (TR 217). Plaintiff reported that the physical therapy exercises to stabilize the spine were making her pain worse. (TR 217). Dr. Ruiz noted that Plaintiff's pinprick sensation was diffusely diminished over the left lower extremity. (TR 217). Plaintiff exhibited tenderness over the left SI joint and pain on range of motion of the bilateral hips and the lumbar spine. (TR 217). Plaintiff was advised to pursue her left-sided SI joint injection and discontinue strengthening exercises in physical therapy. (TR 217). On July 16, 2003 Plaintiff underwent a sacroiliac joint injection to treat for sacroiliac joint pain. (TR 180-81).

In August 2003 Plaintiff complained of pain and paresthesia into her left upper extremity and spasms into the left lower extremity. (TR 216). Dr. Ruiz prescribed Duragesic and Demerol. (TR 216). On September 12, 2003 Plaintiff reported that the Duragesic was making her dizzy and did not help her pain significantly. (TR 215). Dr. Ruiz discussed the possibility of referring Plaintiff for median branch blocks and radiofrequency lesioning of the lumbar spine. (TR 215).

On October 15, 2003 Dr. Ruiz completed a state agency Medical Examination Report and concluded that Plaintiff could frequently lift up to ten pounds, occasionally lift ten to twenty pounds

7

and stand for two hours, walk for one hour and sit for two hours of an eight hour workday. (TR 248). Dr. Ruiz noted no mental limitations. (TR 248). A Physical Residual Functional Capacity Assessment dated November 16, 2003 was consistent with Dr. Ruiz's weight restrictions and further concluded that Plaintiff could stand and/or walk six hours and sit six hours of an eight hour workday. (TR 250). Plaintiff should never climb ladders, ropes or scaffolds and only occasionally climb ramps or stairs, stoop, kneel, crouch or crawl. (TR 251). The examiner noted that Plaintiff's ADL limitations were not supported by radiographs or the physical findings. (TR 254).

On December 5, 2003 Dr. Ruiz prescribed BuSpar for Plaintiff's depressive symptoms. (TR 272). Plaintiff treated with Dr. Ruiz through 2004 and continued to complain of pain in the left lumbar spine and hip areas. (TR 269-71). On June 1, 2004 Plaintiff reported that the BuSpar was partially helping her mood. (TR 270). On June 17, 2004 Dr. Ruiz noted that she strongly disagrees with the report of the Independent Medical Evaluation stating that Plaintiff does not have pathology in the sacroiliac joint area. (TR 269). Plaintiff was taking morphine for pain, however, it was irritating her stomach so Dr. Ruiz prescribed Kadian. (TR 269). In June 2004 Plaintiff reported that Kadian controlled her pain for a full 12 hours. (TR 268). She was more active and she was able to sleep through the night. (TR 268). In January 2005 Dr. Ruiz noted that Plaintiff had been unable to return to the clinic due to nonpayment of her insurance. (TR 266). Plaintiff reported that she could not afford to purchase the Kadian or the Soma. (TR 266).

A March 2, 2005 MRI revealed mild degenerative facet changes to L3-4 and L5-S1 levels and mild central bulging of the L4-5 annulus with no evidence of disc protrusions or extrusions. (TR 277). Plaintiff continued to be treated through June 2005 for pain in her left lower extremity. (TR 259-266). On April 14, 2005 Bachu Abraham, M.D. found that electrodiagnostic testing was

abnormal and found evidence of peroneal neuropathy on the left side. (TR 260). Plaintiff complained of coccygeal pain and Dr. Abraham suggested Plaintiff might benefit from caudal block. (TR 260). In January, February and March 2005 Plaintiff had injections to treat pain and spasm but on April 7, 2005 Plaintiff reported that the injections were not helping to control her pain. (TR 263, 261, 265, 275). A May 5, 2005 two level lumbar discogram and post discogram CT revealed contrast centrally in the nuclear portion with a left paracentral radial annular tear and contrast along the outer margins of the annulus. (TR 274). On June 9, 2005 Dr. Ruiz recommended that Plaintiff be seen by a chiropractor for adjustment of the left sacroiliac joint. (TR 259). Dr. Ruiz did not believe that Plaintiff was a candidate for surgery. (TR 259). Plaintiff also suffers from Raynaud's syndrome and has been treated for environmental allergies, asthma and bronchitis. (TR 188, 190, 196).

**ADMINISTRATIVE LAW JUDGE'S DETERMINATION:**

The ALJ found that although Plaintiff met the disability insured status requirements through December 31, 2002 and suffered from degenerative disc disease of the lumbar spine, sacroiliac strain, and depression, all severe impairments, she did not have an impairment or combination of impairments that met or equaled the Listing of Impairments.[1] (TR 24). The ALJ found Plaintiff's statements concerning her limitations were not entirely credible, she could perform her past relevant work, her exertional and non-exertional limitations allow her to perform a significant range of light work limited to simple, unskilled work tasks, and concluded that she was capable of performing a

---

[1]The ALJ noted he needed further evidence to make a determination that Plaintiff was not engaged in substantial gainful activity. The ALJ did not delay issuance of a decision to obtain that evidence because he relied on the medical record to determine that Plaintiff could perform other work at the light exertional level and Plaintiff's claim could be denied at steps four and five of the evaluation process. (TR 18).

significant number of jobs in the economy. (TR 24). Therefore she was not suffering from a disability under the Social Security Act. (TR 24-25).

**STANDARD OF REVIEW:**

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this Court to try cases *de novo*, resolve conflicts in the evidence or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Commissioner*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

**DISCUSSION AND ANALYSIS:**

Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff was required to show that:

(1) she was not presently engaged in substantial gainful employment; and

(2) she suffered from a severe impairment; and

(3) the impairment met or was medically equal to a "listed impairment;" or

(4) she did not have the residual functional capacity to perform her relevant past work.

*See* 20 C.F.R. §§ 404.1520(a)-(f). If Plaintiff's impairments prevented her from doing her past work, the Commissioner, at step five, would consider her residual functional capacity ("RFC"), age, education and past work experience to determine if she could perform other work. If she could not, she would be deemed disabled. *See* 20 C.F.R. §§ 404.1520(g). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualification to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

Plaintiff alleges that the ALJ erred in finding that Plaintiff could return to her past relevant work, did not properly evaluate Dr. Marshall's opinion regarding Plaintiff's limitations and presented an inaccurate hypothetical to the vocational expert.

***Past Relevant Work***

11

At step four the ALJ made a determination that Plaintiff could perform her past relevant work as a cashier. (TR 22-23). Both Plaintiff and Defendant agree that the language in the ALJ decision stating that Plaintiff could perform her past relevant work as a cashier is erroneous. (Pl's Br. at 7, Def's Br. at 11, TR 22-23). The parties agree that the VE testified in response to the ALJ's RFC that Plaintiff could <u>not</u> perform her past relevant work. (TR 310). The ALJ's finding that Plaintiff could perform her past relevant work was not supported by substantial evidence. However, the ALJ proceeded to a step five determination that Plaintiff could perform a significant number of jobs in the economy. (TR 23). Therefore, the ALJ's step four determination is harmless error and does not itself warrant remand.

### ***State Agency Psychological Consultant's Opinion***

Plaintiff argues that the ALJ did not properly evaluate Dr. Marshall's opinion where Dr. Marshall concluded that Plaintiff was moderately limited in one to two tasks within each category on the Mental Residual Functional Capacity Assessment. (TR 137-38) The findings made by state agency psychological consultants regarding the nature and severity of a claimant's impairments must be treated as expert opinion evidence of a non-examining source according to Social Security Ruling ("SSR") 96-6p. (Tr. 20).

The ALJ cited extensively to Dr. Marshall's assessment, suggesting that he considered it. (TR 20); *See Hoelck v. Comm'r of Social Sec.*, 2008 WL 64705 (5th Cir. Jan. 7, 2008). The ALJ discussed, considered and evaluated Dr. Marshall's conclusion that Plaintiff had moderate limitations. (TR 20). Further, at the end of Dr. Marshall's assessment he referred to the Psychiatric Review Technique form for his functional capacity assessment wherein he noted that Plaintiff "may work better in a low stress environment" and "retains ability to do unskilled tasks on a sustained

basis." (TR 138, 151). The Court does not find a conflict between Dr. Marshall's assessment and either the ALJ's mental impairment assessment or the RFC. Contrary to Plaintiff's argument, the ALJ properly considered and evaluated Dr. Marshall's opinion.

### *Evaluation of Mental Impairments and Hypothetical Question to the Vocational Expert*

Plaintiff argues that the ALJ erred when he did not include Plaintiff's moderate deficiencies of concentration, persistence or pace in his hypothetical to the VE. Plaintiff argues that limiting her to "simple, unskilled work tasks" does not adequately reflect the ALJ's finding that she has "moderate deficiencies in concentration, persistence or pace resulting in failure to complete tasks in a timely manner" and that she "can sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks; however, has some deficiencies in this area which result in incomplete tasks." (Pl's Br. at 14 citing TR 22).

The Commissioner has prescribed rules for evaluating mental impairments. *See* 20 C.F.R. § 404.1520a. The Commissioner first determines whether there is a medically determinable mental disorder specified in one of nine diagnostic categories. *See id.*; 20 C.F.R. Pt. 404. Subpt. P, App. 1 § 12.00A. Thereafter, the Commissioner measures the severity of a mental disorder in terms of functional restrictions, known as the "B" criteria, by determining the frequency and intensity of the deficits.

The "B" criteria require an evaluation in four areas with a relative rating for each area. *See* 20 C.F.R. § 404.1520a(c)(3). The Commissioner must evaluate limitations in activities of daily living, social functioning and concentration, persistence, or pace and rate those on a five-point scale ranging between none, mild, moderate, marked, and extreme. The fourth area is deterioration or decompensation in work or work-like settings and calls for a rating of never, one or two, three, and

13

four or more. "The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity." 20 C.F.R. § 404.1520a(c).

The ALJ determined that Plaintiff had mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, moderate deficiencies in concentration, persistence or pace "resulting in failure to complete tasks in a timely manner" and no episodes of decompensation. (TR 22). The ALJ further noted that Plaintiff "can sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks; however, has some deficiencies in this area which result in incomplete tasks." (TR 22). At step three, however, the ALJ concluded that Plaintiff's impairments did not meet or medically equal any listed impairment. (TR 24).

Plaintiff seeks to equate "moderate" as used in the current version of 20 C.F.R. § 404.1520a(c)(3) with that of "often" as used under the old version of that regulation (as both terms fall on the same place in a five-point scale). Plaintiff relies upon *Bankston v. Comm'r of Soc. Sec.*, 127 F.Supp.2d 820 (E.D. Mich. 2000), to suggest that a mental deficiency occurring 'often' may not be consistent with substantial gainful employment. In *Bankston*, the Court found that one who "often" suffers from difficulties in concentration, persistence, or pace, as used in the old regulations, implies a deficiency in concentration that can be quantified as 50% of the time on a linear scale and which may not be consistent with substantial gainful activity. *See id.* at 826-27. However, there is no authority that defines "moderate" as meaning a 50% deficit. *See Butler-Wade v. Comm'r of Soc. Sec.*, 2005 WL 361530 *7-8 (E.D. Mich. 2005).

The language of 20 C.F.R. § 404.1520a and 20 C.F.R., Pt. 404, Subpt. P., App. 1 § 12.00 suggest that a claimant's functional limitations in daily living, social functioning, or

14

concentration/persistence/pace cannot be quantified with mathematical precision. The regulations' language specifically notes that an ALJ is not to examine a claimant's ability to perform and complete a certain number of tasks but is rather to assess the nature and overall degree of an impairment's interference with a claimant's overall functioning. *See* 20 C.F.R., Pt. 404, Subpt. P., App. 1 § 12.00(C). The Court will not equate "moderate" with "often."

The ALJ found that Plaintiff has the RFC to "perform work except for lifting and carrying more than 20 pounds occasionally and ten pounds frequently; standing and/or walking more than six hours in an eight-hour workday; sitting more than six hours in an eight-hour workday; climbing ramps and stairs; stooping, kneeling, crouching, and crawling more than occasionally; and climbing ladders, ropes, and scaffolds. The claimant is limited to simple, unskilled work tasks." (TR 24). The exertional limitations set forth in the ALJ's RFC are the equivalent of light work under the regulations, with additional non-exertional limitations. *See* 20 C.F.R. § 404.1567(b).

Of the hypothetical questions which the ALJ asked the VE, the following was consistent with the RFC:

> I ask you to consider a hypothetical individual with a residual functional capacity similar to that found in exhibit 16F, which would indicate the ability to occasionally lift and carry 20 lbs., frequently lift and carry 10 lbs. To stand and walk with normal breaks for about six hours in an eight-hour workday; sit with normal breaks for about six hours in an eight-hour workday. Unlimited with regard to pushing and pulling. Limited to occasional climbing of ramps and stairs. No ladders, ropes, of (sic) scaffolds. Occasional kneeling, crouching, and crawling. Also limited to simple routine, repetitive tasks. Considering such a hypothetical individual, could such individual do the claimant's past work, either as the claimant did it, or as it is generally done in the economy?"

(TR 310). The VE responded "No." (TR 310). However, the VE identified other "unskilled" work that the hypothetical individual could perform. (TR 310). The VE testified that this RFC would

"include most unskilled, light work, for which there would be many occupational groups."[2] (TR 310).

However, while the ALJ was not required to incorporate into the hypothetical the broad terminology of the Psychiatric Review Technique form or the Mental Residual Functional Capacity Assessment, once the ALJ makes a factual determination at step three, "he must craft a hypothetical question which encompasses, in concrete terms, the substance of that finding." *Bielat v. Commissioner*, 2003 U.S. Dist. LEXIS 11722, *31 (E.D. Mich. Jan. 29, 2003). The ALJ made a factual finding that Plaintiff's deficiencies would result in incomplete tasks. (TR 22). A hypothetical question referring to "simple, routine, and repetitive tasks," is insufficient to encompass a limitation of "some deficiencies in this area [sustaining focused attention and concentration] which result in incomplete tasks." (TR 22); *see also Bielat*, 2003 U.S. Dist LEXIS 11722 * 36; *McGuire v. Apfel*, 1999 U.S. Dist. LEXIS 11733, *40 (D. Ore. 1999) ("Numerous people who only have the ability to perform simple, no-skilled tasks, can still perform those tasks in a timely manner."). The VE's testimony did not encompass this limitation which the ALJ expressly found to exist. Therefore, the VE's testimony cannot support the ALJ's determination that Plaintiff can perform a significant number of jobs in the economy.

The ALJ based his denial of benefits on the VE's testimony in response to an inaccurate hypothetical question. Therefore, a remand is required to determine what the VE would say in

---

[2]The VE testified that examples include production inspector with 6,400 jobs in the Michigan economy (including paint spray inspector no. 741.687-010 and floor worker no. 788.687-046) and machine operator with 14,000 unskilled light jobs in the Michigan economy (including bonding machine operator no. 690.685-154 and riveting machine operator no. 699.685-030). The VE further testified that using a cane in the right hand would eliminate these jobs at the light exertional level and the individual "would need to get down to sedentary" work. (TR 311).

16

response to a hypothetical question that includes Plaintiff's limitations resulting in incomplete tasks, as determined by the ALJ.

**RECOMMENDATION:**

The Commissioner's decision is not supported by substantial evidence. Both Defendant's and Plaintiff's Motions for Summary Judgment should be DENIED and the instant case remanded for further proceedings consistent with this report and recommendation.

**REVIEW OF REPORT AND RECOMMENDATION:**

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: May 16, 2008                    s/ Mona K. Majzoub_____
                                       MONA K. MAJZOUB
                                       UNITED STATES MAGISTRATE JUDGE

± 

## **PROOF OF SERVICE**

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: May 16, 2008                    s/ Lisa C. Bartlett_____
                                       Courtroom Deputy